UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MASSACHUSETTS LABORERS' ANNUITY FUND, Individually and on Behalf of All Others Similarly Situated, | No.  13-CV-2564 |
| | CLASS ACTION |
| Plaintiff, | COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| vs. | |
| ITT EDUCATIONAL SERVICES, INC., KEVIN M. MODANY, and DANIEL M. FITZPATRICK, | JURY TRIAL DEMANDED |
| Defendants. | |

Plaintiff Massachusetts Laborers' Annuity Fund ("Massachusetts Laborers" or "Plaintiff"), by and through its undersigned counsel, alleges the following individually and on behalf of a class of all persons and entities similarly situated, upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's allegations are based upon the investigation of Plaintiff's counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by ITT Educational Services, Inc. ("ITT" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**INTRODUCTION**

1.        This is a federal securities class action brought on behalf of all persons who purchased or otherwise acquired the publicly-traded common stock of ITT (the "Class") between April 24, 2008 and February 25, 2013, inclusive (the "Class Period") seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act") against ITT and certain of its officers and/or directors.

2.        ITT is a provider of postsecondary degree programs in the United States.  The Company offers master's, bachelor's, and associate's degree programs to approximately 61,000 students through 149 locations in 39 states.  While the majority of ITT student tuition is paid through financial aid provided by federal or state governments, such aid is often insufficient to cover tuition costs.  As a result, ITT's students frequently resort to private student loans to fill this funding gap.

3.        Prior to the start of the Class Period, funding sources for private student loans dwindled in connection with the widespread reduction in private lending that resulted from the financial crisis.  This reduction in private student lending posed a direct threat to one of ITT's key revenue streams.

4.        In order to maintain its strong earnings and profits in the face of the contracting market for private student loans, ITT entered into a series of risk-sharing agreements ("RSAs") with third-party lenders in 2007, 2009, and 2010.  The purpose of the RSAs was to incentivize those lenders to continue issuing loans to ITT students despite the deteriorating credit market.  Pursuant to each RSA, the third-party lenders established and funded dedicated trusts that provided the capital for loans to ITT students.  In exchange, ITT provided substantial repayment guarantees to those third-party lenders to ensure that they would be repaid in the event the

students defaulted on their loans.  The combined amount of the loans covered by the RSAs that have been disclosed by the Company to date is in the hundreds of millions of dollars.

5.    Although ITT assumed the risk of guaranteeing the loans issued under each RSA, ITT did not properly account for those risks by establishing adequate reserves to cover expected losses.  Because such reserves diminish a company's reported earnings, as a result of ITT's failure to adequately reserve for its liability under the RSAs, ITT overstated its financial results and concealed the true extent of the risks that it faced under the RSAs.

6.    On July 26, 2012, the truth regarding ITT's significant liability under the RSAs began to be revealed.  Up to this point, all of ITT's exposure to losses arising from student loans issued under the RSAs had been kept off ITT's balance sheet through improper accounting practices.  However, when ITT was unable to secure lenders to fund a new RSA following the expiration of the 2010 RSA (the "PEAKS Program"), ITT began lending to students directly. The performance of these direct loans was so poor that the Company was forced to increase its allowance for doubtful accounts and its bad debt expense.  When the Company disclosed the poor performance of the loans it had initiated directly, the Company also implicitly revealed to investors for the first time that the loans previously issued through the RSAs had experienced similarly poor performance.  In reaction to these disclosures on July 26, 2012, ITT's stock price fell $7.65 per share, or 15.1 percent, to close at $42.78 per share.

7.    Several months later, on January 4, 2013, ITT announced that it had settled an action brought by Sallie Mae arising out of the Company's guarantee obligations under the 2007 RSA.  ITT settled this action for $46 million—nearly double the $26 million that Sallie Mae originally sought, and significantly more than shareholders were led to expect based on the Company's prior statements.  In connection with this settlement, ITT took a $13.2 million charge

for the 2007 RSA and an additional $70 million charge to establish a reserve related to the 2009

and 2010 RSAs. These charges, and in particular the reserve for likely losses on the 2009 and

2010 RSAs, for the first time revealed the extent of the risk ITT faced from all three RSAs.

Those reserves should have been established long before January 2013, and, by not setting aside

such reserves, the Company significantly understated its liabilities and overstated its net income.

Following the disclosure of the Sallie Mae settlement and the implications for the Company's

liability under all the RSAs, the price of ITT stock dropped $3.72 per share, or 19.2 percent, to

close at $15.57 per share on January 7, 2013.

8.      Then, on February 22, 2013, ITT revealed that it had received a subpoena from

the SEC on February 8, 2013, which requested the production of documents relating to ITT's

accounting for the 2009 and 2010 RSAs. During the Class Period, ITT remained steadfast in its

position that it was not required to include the liabilities from the RSAs on its balance sheet. By

refusing to include liabilities from the RSAs on its financial statements, the Company improperly

understated its liabilities and overstated its financial strength. Following the announcement of

the SEC subpoena, ITT's stock price declined $3.10 per share, or 16.6 percent, to close at $15.53

per share on February 25, 2013.

9.      The true facts, which were known by the Defendants but concealed from the

investing public during the Class Period, were as follows:

        (a)      the Company had tremendous liability under the RSAs;

        (b)      the Company continually downplayed its risks associated with the RSAs

and assured investors that it had properly set aside reserves to meet its liabilities;

(c)      the Company was improperly accounting for the RSAs, and its accounting practices were repeatedly questioned by the SEC and are now the subject of a formal SEC investigation; and

(d)      by failing to book adequate reserves for its liabilities under the RSAs, the Company misrepresented its earnings throughout the Class Period.

10.      As a result of Defendants' false statements, ITT common stock traded at artificially inflated levels during the Class Period.  However, as the truth about ITT's inadequate reserves and improper accounting practices and their effects on the Company's business was gradually revealed to investors, the Company's share price dramatically declined.

## JURISDICTION AND VENUE

11.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.P.R. § 240.10b-5.

12.      This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 28 U.S.C. § 1331 [15 U.S.C. § 78a(a)].

13.      Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  ITT maintains offices in this District and many of the acts that constitute the violations of law complained of herein, including dissemination to the public of materially false and misleading information to the investing public, occurred in and/or were issued from this District.

14.      In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

15.     Plaintiff Massachusetts Laborers is based in Burlington, Massachusetts.  Its members build infrastructure and buildings such as roads, tunnels, bridges, and skyscrapers.  As of June 30, 2012, Massachusetts Laborers managed $763 million in assets on behalf of more than 22,000 participants and beneficiaries.

16.     Defendant ITT is a Delaware corporation whose subsidiaries and affiliates provide postsecondary degree programs in the United States.  ITT maintains its principal executive offices at 13000 North Meridian Street, Carmel, Indiana 46032.  ITT operates three campuses in New York in the following locations: (1) 13 Airline Drive, Albany, New York 12205; (2) 2295 Millersport Highway, P.O. Box 327, Getzville, New York 14068; and (3) 235 Greenfield Parkway, Liverpool, New York 13088-6651.  ITT's common stock trades under the ticker symbol "ESI" on the New York Stock Exchange (the "NYSE"), which is an efficient market.

17.     Defendant Kevin M. Modany ("Modany") is, and at relevant times was, Chief Executive Officer ("CEO") and Chairman of the Board of ITT.  Throughout the Class Period, Modany spoke frequently to investors and signed and certified the accuracy of ITT's Forms 10-K for the fiscal years ended 2008, 2009, 2010, 2011, and 2012 and also certified the accuracy of the Company's Forms 10-Q for the periods ended March 31, 2008, June 30, 2008, September 30, 2008, March 31, 2009, June 30, 2009, September 30, 2009, March 31, 2010, June 30, 2010, September 30, 2010, March 31, 2011, June 30, 2011, September 30, 2011, March 31, 2012, June 30, 2012, and September 30, 2012.

18.     Defendant Daniel M. Fitzpatrick ("Fitzpatrick") is, and at relevant times was, Chief Financial Officer ("CFO") and Executive Vice President of ITT.  Throughout the Class Period, Fitzpatrick spoke frequently to investors and signed and certified the accuracy of ITT's Forms

10-K for the fiscal years ended 2008, 2009, 2010, 2011, and 2012, and also signed and certified the accuracy of the Company's Forms 10-Q for the periods ended March 31, 2008, June 30, 2008, September 30, 2008, March 31, 2009, June 30, 2009, September 30, 2009, March 31, 2010, June 30, 2010, September 30, 2010, March 31, 2011, June 30, 2011, September 30, 2011, March 31, 2012, June 30, 2012, and September 30, 2012.

19.     Defendants Modany and Fitzpatrick are collectively referred to herein as the "Individual Defendants."  Together with Defendant ITT, the Individual Defendants are collectively referred to herein as "Defendants."

## BACKGROUND

20.     Founded in 1946, ITT provides post-secondary degree programs in the United States.  It offers master's, bachelor's, and associate's degree programs, and career-oriented education programs in various fields, such as information technology, electronics technology, drafting and design, business, criminal justice, and nursing and health sciences.  The Company services approximately 61,000 students through 149 locations in 39 states, as well as online programs to students who are located in 48 states.

21.     While the majority of ITT student tuition is paid through financial aid provided by federal or state governments, such aid is often insufficient to cover tuition costs.  As a result, ITT's students frequently resort to private student loans to fill this funding gap.  Prior to the start of the Class Period, funding sources for private student loans dwindled as private lending diminished as a result of the financial crisis.  This reduction in private student lending posed a direct threat to one of ITT's key revenue streams.

22.     In order to maintain its strong earnings and profits in the face of the contracting market for private student loans, ITT strategically entered into a series of RSAs in order to

encourage third-party lenders to continue issuing student loans despite deterioration in the credit market.

23.     First, in October 2007, ITT entered into a RSA (the "2007 RSA") with Sallie Mae, an unaffiliated lender, for private loans to be provided to its students by or through that lender to help pay the students' cost of education that student financial aid from federal, state, and other sources did not cover.  Under the 2007 RSA, the Company guaranteed the repayment of any private education loans that the lender charged off above a certain percentage.  The RSA was terminated effective February 22, 2008, such that no private education loans would be made under the RSA after that date, but loans made under the RSA prior to that date would still be covered by ITT's substantial guarantee obligations.

24.     Second, in February 2009, ITT entered into another RSA (the "2009 RSA") with an unaffiliated third party.  Like the 2007 RSA, under the 2009 RSA the Company guaranteed the repayment of any private education loans that were charged off above a certain percentage of the private education loans made under the 2009 RSA.

25.     Third, on January 20, 2010, ITT entered into a guarantee agreement and related documents in connection with a new private education loan program for its students, the PEAKS program.  Under the PEAKS Program, an unaffiliated lender would make private education loans to eligible students and, subsequently, sell those loans to a trust.  The trust issued senior debt in the aggregate principal amount of $300 million ("Senior Debt") to investors.  The assets of the trust (which included, among other assets, the student loans held by the trust), served as collateral for, and were intended to be the principal source of, the repayment of the Senior Debt.  The Senior Debt bears interest at a variable rate based on the London Interbank Offered Rate plus a margin, and matures in January 2020.  In connection with the PEAKS Program, ITT

transferred to the trust a portion of the amount of each private student loan disbursed to it, in exchange for a subordinated note issued by the trust to ITT.  Under the guarantee agreement, ITT guaranteed payment of principal, interest and certain call premiums on the Senior Debt, and administrative fees and expenses of the trust.  Due to the guarantee, ITT was required to consider whether a liability should be accrued on its balance sheet.  ITT determined not to record such liability.

26.     The combined amount of the loans covered by the 2007 RSA, 2009 RSA, and the PEAKS Program that have been disclosed by ITT to date is in the hundreds of millions of dollars.

27.     Using RSA-funded loans to boost its revenues and profits while concealing the massive risk facing the Company from its guarantees to the third-party lenders, ITT misstated its financial condition throughout the Class Period.  While the existence of the RSAs was disclosed to investors, the Company falsely assured investors that its exposure under the RSAs was limited and conservatively calculated.  For example, in its quarterly report on Form 10-Q filed with the SEC on April 24, 2008—the first day of the Class Period—the Company stated that its "recorded liability related to the [2007] RSA as of March 31, 2008 was not material."  Similarly, on April 23, 2009, the Company stated that the "undiscounted maximum potential future payments that we would be required to make under the 2009 RSA" was "not material."  During a May 25, 2010 earnings call, CEO Kevin Modany stated that, with respect to its exposure under the 2009 RSA, ITT "tr[ies] to be ultraconservative relative to any down side associated with the performance of the portfolio, and [is] extremely conservative relative to that."  ITT gave similar assurances with respect to its exposure under the 2007 RSA as well as the PEAKS Program.

28.     Accounting rules required ITT to hold certain funds in reserve in order to meet its obligations under the RSAs, and establishing such reserves would have offset income on a dollar-for-dollar basis.  Throughout the Class Period, ITT repeatedly assured investors that its reserves were sufficient to meet its RSA liabilities.  Specifically, during an October 20, 2011 earnings call, CEO Modany assured investors that "we're fully reserved for [the 2007 RSA] at this particular point."  During that same call, CEO Modany also stated that ITT's reserve rate for its exposure under the PEAKS Program was more than adequate, telling investors that the program was "over-collateralized" and that "the performance on the loans has to be substantially worse than any historical experience we've seen, for us to have exposure here."  At the same time, ITT announced earnings of $2.48 per share, exceeding analyst estimates for the third straight quarter that year.

### DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

29.     On April 24, 2008, the first day of the Class Period, ITT issued a press release with its results for the first quarter of 2008, ended March 31.  The Company announced that its diluted earnings per share ("EPS") increased 63.6 percent to $1.08 compared to $0.66 in the first quarter of 2007.

30.     Later that day, ITT filed with the SEC its quarterly report on Form 10-Q for the first quarter of 2008 (the "1Q2008 10-Q"), which included the same results previously reported in the Company's April 24, 2008 press release.  In the 1Q2008 10-Q, ITT assured investors that its "recorded liability related to the [2007] RSA as of March 31, 2008 was not material."  The 1Q2008 10-Q was signed by CFO Fitzpatrick and contained certifications by CEO Modany and CFO Fitzpatrick that attested to the purported accuracy and completeness of the Company's 1Q2008 10-Q.

31.    On July 24, 2008, ITT issued a press release with its results for the second quarter of 2008, ended June 30.  The Company announced that its diluted EPS increased 37.9 percent to $1.20 compared to $0.87 in the second quarter of 2007.

32.    Later that day, ITT filed with the SEC its quarterly report on Form 10-Q for the second quarter of 2008 (the "2Q2008 10-Q"), which included the same results previously reported in the Company's July 24, 2008 press release.  In the 2Q2008 10-Q, ITT continued to assure investors that its "recorded liability related to the [2007] RSA as of June 30, 2008 was not material."  The 2Q2008 10-Q was signed by CFO Fitzpatrick and contained certifications by CEO Modany and CFO Fitzpatrick that attested to the purported accuracy and completeness of the Company's 2Q2008 10-Q.

33.    On October 23, 2008, ITT issued a press release with its results for the third quarter of 2008, ended September 30.  The Company announced that its diluted EPS increased 30.6 percent to $1.28 compared to $0.98 in the third quarter of 2007.

34.    Later that day, ITT filed with the SEC its quarterly report on Form 10-Q for the third quarter of 2008 (the "3Q2008 10-Q"), which included the same results previously reported in the Company's October 23, 2008 press release.  In the 3Q2008 10-Q, ITT continued to assure investors that its "recorded liability related to the [2007] RSA as of September 30, 2008 was not material."  The 3Q2008 10-Q was signed by CFO Fitzpatrick and contained certifications by CEO Modany and CFO Fitzpatrick that attested to the purported accuracy and completeness of the Company's 3Q2008 10-Q.

35.    On January 22, 2009, ITT issued a press release announcing that its diluted EPS in the fourth quarter of 2008, ended December 31, increased 34.2 percent to $1.61 compared to $1.20 in the fourth quarter of 2007.

36.    On February 18, 2009, ITT filed with the SEC its annual report on Form 10-K for the fiscal year 2008 (the "2008 10-K"), which included the same results previously reported in the Company's January 22, 2009 press release.  In the 2008 10-K, ITT continued to assure investors that its "recorded liability related to the [2007] RSA as of December 31, 2008 was not material."  The 2008 10-K was signed by CEO Modany and CFO Fitzpatrick, along with members of ITT's board of directors, and contained certifications by Modany and Fitzpatrick that attested to the purported accuracy and completeness of the Company's 2008 10-K.

37.    On February 23, 2009, ITT executives spoke with analysts, media representatives, and investors at the Credit Suisse Group Global Services Conference.  During the conference, CFO Fitzpatrick minimized the Company's exposure under the 2009 RSAs, entered into the previous week, by representing to investors that:  "[I]n terms of the risk share, we would not expect that we would have any [profit and loss statement] implications relative to that risk share.  We don't expect that we'll have to book a reserve."

38.    On April 23, 2009, ITT issued a press release with its results for the first quarter of 2009.  The Company announced that its diluted EPS increased 47.2 percent to $1.59 compared to $1.08 in the first quarter of 2008.

39.    After releasing its first quarter 2009 results on April 23, 2009, ITT hosted a conference call for analysts, media representatives, and investors during which CEO Modany represented to investors that, despite the poor condition of the economy, the Company's guarantee obligations under the RSAs would not be triggered.  Specifically, Modany stated that under the RSAs:  "[t]here's no reserve requirements on our part.  We have a risk share arrangement.  But the level is much, much higher than historical rates such that we certainly do

not anticipate that ever being triggered, even with consideration for the current economic environment."

40.     Later that day, ITT filed with the SEC its quarterly report on Form 10-Q for the first quarter of 2009 (the "1Q2009 10-Q"), which included the same results previously reported in the Company's April 23, 2009 press release.  In the 1Q2009 10-Q, the Company downplayed its exposure under the RSAs.  For example, according to 1Q2009 Form 10-Q, "the undiscounted maximum potential future payments that [ITT] would be required to make under the 2009 RSA and the amount of the liability as of March 31, 2009 were not material."  The 1Q2009 10-Q similarly assured investors that ITT's "recorded liability related to the 2007 RSA as of March 31, 2009 was not material."

41.     The 1Q2009 10-Q was signed by CFO Fitzpatrick and contained certifications by CEO Modany and CFO Fitzpatrick that attested to the purported accuracy and completeness of the Company's 1Q2009 10-Q.

42.     On July 23, 2009, ITT issued a press release with its results for the second quarter of 2009.  The Company announced that its diluted EPS increased 55.8 percent to $1.87 compared to $1.20 in the second quarter of 2008.

43.     Later that day, ITT filed with the SEC its quarterly report on Form 10-Q for the second quarter of 2009 (the "2Q2009 10-Q"), which included the same results previously reported in the Company's July 23, 2009 press release.  In the 2Q2009 10-Q, the Company continued to assure investors that it "did not record a liability for our guarantee obligations under the 2009 RSA as of June 30, 2009, because we do not anticipate that the private education loans charged off will exceed the percentage that would require us to make a payment under our guarantee."  The 2Q2009 10-Q also assured investors that ITT's "recorded liability related to the

2007 RSA as of June 30, 2009 was not material." The 2Q2009 10-Q was signed by CFO

Fitzpatrick and contained certifications by CEO Modany and CFO Fitzpatrick that attested to the

purported accuracy and completeness of the Company's 2Q2009 10-Q.

44.     On October 22, 2009, ITT issued a press release with its results for the third

quarter of 2009. The Company announced that its diluted EPS increased 56.3 percent to $2.00

compared to $1.28 in the third quarter of 2008.

45.     After releasing its third quarter 2009 results on October 22, 2009, ITT hosted a

conference call for analysts, media representatives, and investors during which CEO Modany

again assured investors that the Company could not envision any scenario under which ITT

would have to incur a charge pursuant to its obligations under the RSAs. Specifically, Modany

stated that: "We don't see any kind of scenario; and of course, we're stressing these things as

you would expect given the current environment. We don't see any scenario where we've got

any kind of charge that we'd record as a result of that guarantee that we provide."

46.     Later that day, ITT filed with the SEC its quarterly report on Form 10-Q for the

third quarter of 2009 (the "3Q2009 10-Q"), which included the same results previously reported

in the Company's October 22, 2009 press release. In the 3Q2009 10-Q, ITT continued to

minimize its liability under the RSAs, once against representing that it "did not record a liability

for our guarantee obligations under the 2009 RSA as of September 30, 2009, because we do not

anticipate that the private education loans charged off will exceed the percentage that would

require us to make a payment under our guarantee." The Company also continued to assure

investors that its "recorded liability related to the 2007 RSA as of September 30, 2009 was not

material."

47.     The 3Q2009 10-Q was signed by CFO Fitzpatrick and contained certifications by CEO Modany and CFO Fitzpatrick that attested to the purported accuracy and completeness of the Company's 3Q2009 10-Q.

48.     On January 21, 2010, ITT issued a press release announcing that its diluted EPS for the fourth quarter of 2009 increased 59.0 percent to $2.56 compared to $1.61 in the fourth quarter of 2008.

49.     After releasing its fourth quarter 2009 results on January 21, 2010, ITT hosted a conference call for analysts, media representatives, and investors during which CFO Fitzpatrick described the 2010 RSA, known as the PEAKS Program.  Fitzpatrick assured investors that "we do not believe that we will be required to make any material payments under our guarantee." Fitzpatrick also stated that the Company would maintain an adequate reserve to meet any potential obligations under the PEAKS Program, telling investors that:

> [W]e've stressed this structure well beyond, and I mean well beyond historical performance that should provide for a very good result for us.  And all of that in terms of that reserving, that extra cushioning that we're talking about, it is reflected in those 2010 goals that we put out today.

50.     On February 19, 2010, ITT filed with the SEC its annual report on Form 10-K for the fiscal year 2009 (the "2009 10-K"), which included the same results previously reported in the Company's January 21, 2010 press release.  With respect to the 2009 RSA, the Company continued to assure investors that it "did not record a liability for our guarantee obligations under the 2009 RSA as of December 31, 2009, because we do not anticipate that the amount of private education loans charged off will exceed the percentage that would require us to make a payment under our guarantee."

51.    In the 2009 10-K, the Company also continued to assure investors that its "recorded liability related to the 2007 RSA as of December 31, 2009 was not material."

52.    The 2009 10-K was signed by CEO Modany and CFO Fitzpatrick, along with other ITT executives and contained certifications by Modany and Fitzpatrick that attested to the purported accuracy and completeness of the Company's 2009 10-K.

53.    On April 22, 2010, ITT issued a press release announcing its first quarter 2010 financial results. The Company reported net income of $87.5 million, or $2.46 diluted EPS, and revenue of $384.0 million for the first quarter of 2010.

54.    Later that day, ITT filed with the SEC its quarterly report Form 10-Q for the first quarter of 2010 (the "1Q2010 10-Q"), which included the same results previously reported in the Company's April 22, 2010 press release. In the 1Q2010 10-Q, the Company explained that, based on its interpretation of accounting guidelines, it was not required to include the results related to the PEAKS Program in its financial statements. Specifically, the 1Q2010 10-Q stated that ITT "held a variable interest in the trust, but we are not considered the primary beneficiary for purposes of including the financial results of the trust in our consolidated financial statements."

55.    The Company also continued to downplay its liability under the RSAs by conveying to investors that "[a]s of March 31, 2010, we had not made any guarantee payments under the PEAKS Program, the 2009 RSA or the 2007 RSA, and our recorded liability for the guarantee obligations related to those arrangements was not material."

56.    The 1Q2010 10-Q was signed by CFO Fitzpatrick and contained certifications by CEO Modany and CFO Fitzpatrick that attested to the purported accuracy and completeness of the Company's 1Q2010 10-Q.

57.     On May 25, 2010, ITT executives spoke with analysts, media representatives, and investors at the Bank of America Merrill Lynch Services Conference.  During the conference, CEO Modany continued to assure investors of the Company's conservative approach toward calculating its exposure under the RSAs.  Specifically, Modany explained that the Company was "comfortable" with the PEAKS Program because:

> [W]e look at the data that we have collected historically and we try to be ultraconservative relative to any down side associated with the performance of the portfolio, and be extremely conservative relative to that . . . .  And we can't give you the numbers, but it is multiples of what we have experienced in terms of what this thing can handle before we would see any kind of modification to our financial results.

58.     On July 22, 2010, ITT issued a press release announcing its second quarter 2010 financial results.  The Company reported net income of $96.0 million, or $2.78 in diluted EPS, and revenue of $401.8 million for the second quarter of 2010.

59.     On July 23, 2010, ITT filed with the SEC its quarterly report on Form 10-Q for the second quarter of 2010 (the "2Q2010 10-Q"), which included the same results previously reported in the Company's July 22, 2010 press release.  In the 2Q2010 10-Q, the Company once again assured investors that it properly omitted its obligations under the RSAs from its financial statements.  Specifically, ITT stated that it is "not the primary beneficiary of the PEAKS Trust" and is, therefore, "not required under ASC 810 to include the financial results of the PEAKS Trust in our condensed consolidated financial statements."

60.     In the 2Q2010 10-Q, ITT made similar representations regarding the 2009 RSA, informing investors that the Company is "not the primary beneficiary of the 2009 Entity" and is "not required under ASC 810 to include the financial results of the 2009 Entity in our condensed consolidated financial statements."

61.    The 2Q2010 10-Q also continued downplay the Company's liability under the RSAs, stating that "[a]s of June 30, 2010, we had not made any guarantee payments under the PEAKS Guarantee, the 2009 RSA or the 2007 RSA, and our recorded liability for the guarantee obligations related to those arrangements was not material."

62.    The 2Q2010 10-Q was signed by CFO Fitzpatrick and contained certifications by CEO Modany and CFO Fitzpatrick that attested to the purported accuracy and completeness of the Company's 2Q2010 10-Q.

63.    On October 21, 2010, ITT issued a press release announcing its third quarter 2010 financial results.  The Company reported net income of $93.2 million, or $2.82 in diluted EPS, and revenue of $400.6 million for the third quarter of 2010.

64.    On October 22, 2010, ITT filed with the SEC its quarterly report on Form 10-Q for the third quarter of 2010 (the "3Q2010 10-Q"), which included the same results previously reported in the Company's October 21, 2010 press release.  In the 3Q2010 10-Q, ITT assured investors that it properly omitted its obligations under the RSAs from its financial statements. Once again, the Company represented that it was "not the primary beneficiary of the PEAKS Trust" and was, therefore, "not required under ASC 810 to include the financial results of the PEAKS Trust in our condensed consolidated financial statements."

65.    In the 3Q2010 10-Q, ITT made similar representations with respect to the 2009 RSA, telling investors that the Company is "not the primary beneficiary of the 2009 Entity" and, as a result, is "not required under ASC 810 to include the financial results of the 2009 Entity in our condensed consolidated financial statements."

66.    The Company also continued to assure investors in its 3Q2010 10-Q that "[a]s of September 30, 2010, we had not made any guarantee payments under the PEAKS Guarantee, the

2009 RSA or the 2007 RSA, and our recorded liability for the guarantee obligations related to those arrangements was not material."

67.    The 3Q2010 10-Q was signed by CFO Fitzpatrick and contained certifications by CEO Modany and CFO Fitzpatrick that attested to the purported accuracy and completeness of the Company's 3Q2010 10-Q.

68.    On January 20, 2011, ITT issued a press release announcing its fourth quarter and full-year 2010 financial results.  The Company reported net income of $97.5 million, or $3.14 in diluted EPS, and revenue of $410.1 million for the fourth quarter of 2010.  The Company further reported net income of $374.2 million, or $11.17 in diluted EPS, and revenue of $1.6 billion for the full year of 2010.

69.    On February 18, 2011, ITT filed with the SEC its annual report on Form 10-K for the fiscal year 2010 (the "2010 10-K"), which included the same results previously reported in the Company's January 20, 2011 press release.  Assuring investors that it properly accounted for its obligations under the RSAs, the Company continued to represent that it was "not the primary beneficiary of the PEAKS Trust" and was "not required under ASC 810 to include the financial results of the PEAKS Trust in our consolidated financial statements."

70.    In the 2010 10-K, the Company also assured investors that it was "not the primary beneficiary of the 2009 Entity" and, "[a]s a result, we are not required under ASC 810 to include the financial results of the 2009 Entity in our consolidated financial statements for the fiscal year ended December 31, 2010."

71.    The 2010 10-K also continued to downplay the Company's exposure under the RSAs by stating that "[a]s of December 31, 2010, we had not made any guarantee payments

under the PEAKS Guarantee, the 2009 RSA or the 2007 RSA, and our recorded liability for the guarantee obligations related to those arrangements was not material."

72.    The 2010 10-K was signed by CEO Modany and CFO Fitzpatrick, along with other ITT executives. The 2010 10-K also contained certifications by Modany and Fitzpatrick that attested to the purported accuracy and completeness of the Company's 2010 10-K.

73.    On April 21, 2011, ITT issued a press release announcing its first quarter 2011 financial results. The Company reported net income of $85.4 million, or $2.91 in diluted EPS, and revenue of $383.2 million for the first quarter of 2011.

74.    On April 22, 2011, ITT filed with the SEC its quarterly report on Form 10-Q for the first quarter of 2011 (the "1Q2011 10-Q"), which included the same results previously reported in the Company's April 21, 2011 press release. Once again, the 1Q2011 10-Q stated that ITT properly omitted its obligations under the RSAs from its financial statements. Specifically, the 1Q2011 10-Q stated that ITT was "not the primary beneficiary of the PEAKS Trust" and, therefore, was "not required under ASC 810 to include the financial results of the PEAKS Trust in our condensed consolidated financial statements."

75.    The 1Q2011 10-Q made similar representations with respect to the 2009 RSA, stating that the Company was "not the primary beneficiary of the 2009 Entity" and "[a]s a result, we are not required under ASC 810 to include the financial results of the 2009 Entity in our condensed consolidated financial statements."

76.    In the 1Q2011 10-Q, the Company also continued to downplay its exposure under the RSAs by stating that "[a]s of March 31, 2011, our recorded liability for the guarantee obligations related to those arrangements was not material."

77.    The 1Q2011 10-Q was signed by CFO Fitzpatrick and contained certifications by CEO Modany and CFO Fitzpatrick that attested to the purported accuracy and completeness of the Company's 1Q2011 10-Q.

78.    On July 21, 2011, ITT issued a press release announcing its second quarter 2011 financial results.  The Company reported net income of $79.0 million, or $2.85 in diluted EPS, and revenue of $387.9 million for the second quarter of 2011.

79.    On July 25, 2011, ITT filed with the SEC its quarterly report Form 10-Q for the second quarter of 2011 (the "2Q2011 10-Q"), which included the same results previously reported in the Company's July 21, 2011 press release.  In the 2Q2011 10-Q, the Company assured investors that it properly accounted for its obligations under the RSAs in its financial statements.  In particular, the 2Q2011 10-Q stated that ITT was "not the primary beneficiary of the PEAKS Trust" and was "not required under ASC 810 to include the financial results of the PEAKS Trust in our condensed consolidated financial statements."

80.    The 2Q2011 10-Q made similar representations with respect to the 2009 RSA, stating that the Company was "not the primary beneficiary of the 2009 Entity" and "[a]s a result, we are not required under ASC 810 to include the financial results of the 2009 Entity in our condensed consolidated financial statements."

81.    In the 2Q2011 10-Q, the Company also continued to downplay its exposure under the RSAs by stating that "[a]s of June 30, 2011, our recorded liability for the guarantee obligations related to these arrangements was not material."

82.    The 2Q2011 10-Q was signed by CFO Fitzpatrick and contained certifications by CEO Modany and CFO Fitzpatrick that attested to the purported accuracy and completeness of the Company's 2Q2011 10-Q.

83.     On October 20, 2011, ITT issued a press release announcing its third quarter 2011 financial results.  The Company reported net income of $67.3 million, or $2.48 in diluted EPS, and revenue of $360.6 million for the third quarter of 2011.

84.     During its third quarter 2010 earnings conference call, CEO Modany continued to assure investors that the Company was fully reserved against any liabilities it faced under the 2007 RSA, by explaining that "we feel like we're fully reserved for that at this particular point."

85.     Also during the October 20 earnings call, in response to a question regarding reserve rates used for loans issued pursuant to the PEAKS program, CEO Modany explained that the PEAKS Program was over-collateralized with respect to its potential obligations under the RSAs.  In particular, Modany told investors that PEAKS "is a program that's over-collateralized in terms of the assets that are backing the notes associated with this program, and the performance on the loans has to be substantially worse than any historical experience we've seen, for us to have exposure here."

86.     On October 21, 2011, ITT filed with the SEC its quarterly report on Form 10-Q for the third quarter of 2011 (the "3Q2011 10-Q"), which included the same results previously reported in the Company's October 20, 2011 press release.  In the 3Q2011 10-Q, the Company again assured investors that it properly omitted its liabilities under the RSAs from its financial statements.  Specifically, ITT stated that it was "not the primary beneficiary of the PEAKS Trust" and, therefore, was "not required under ASC 810 to include the financial results of the PEAKS Trust in our condensed consolidated financial statements."

87.     Similarly, the 3Q2011 10-Q stated that the Company was "not the primary beneficiary of the 2009 Entity" and "[a]s a result, we are not required under ASC 810 to include the financial results of the 2009 Entity in our condensed consolidated financial statements."

88.     The 3Q2011 10-Q was signed by CFO Fitzpatrick and contained certifications by CEO Modany and CFO Fitzpatrick that attested to the purported accuracy and completeness of the Company's 3Q2011 10-Q.

89.     On January 26, 2012, ITT issued a press release reporting its fourth quarter and full-year 2011 financial results.  The Company reported net income of $76.0 million, or $2.87 in diluted EPS, and revenue of $368.3 million for the fourth quarter of 2011.  The Company further reported net income of $307.8 million, or $11.13 in diluted EPS, and revenue of $1.5 billion for the full-year 2011.

90.     On February 24, 2012, ITT filed with the SEC its annual report on Form 10-K for the fiscal year 2011 (the "2011 10-K"), which included the same results previously reported in the Company's January 26, 2012 press release.  In the 2011 10-K, ITT continued to assure investors that it its accounting treatment of the RSAs was proper because the Company was "not the primary beneficiary of the PEAKS Trust."

91.     The 2011 10-K also stated that the Company was "not the primary beneficiary of the 2009 Entity" and "[a] s a result, we are not required under ASC 810 to include the financial results of the 2009 Entity in our consolidated financial statements."

92.     The 2011 10-K was signed by CEO Modany and CFO Fitzpatrick, along with other ITT executives.  The 2011 10-K also contained certifications by Modany and Fitzpatrick that attested to the purported accuracy and completeness of the Company's 2011 10-K.

93.     On March 13, 2012, ITT executives spoke with analysts, media representatives, and investors at the Credit Suisse Global Services Conference, during which CEO Modany continued to downplay ITT's exposure under the RSAs.  Specifically, Modany told investors that there is a "lack of understanding" among investors as to the Company's risk under the PEAKS

Program and assured investors that "we have excessive collateralization in that portfolio such that there really isn't any expectation from our perspective that we would ever have to provide any additional funding to support that program."

94.    CEO Modany also explained that the PEAKS Program was over-collateralized. In particular, Modany stated that:

> [T]here's a level of conservatism there that there is some expectation that there will be funds that come back to the Company, i.e., we have more than enough excessive collateralization in there, but we've not recorded that amount as an asset on our books.  So we have this sort of contingent asset, which goes above and beyond exposure that might be there again, a conservative way to report this and account for it.

95.    On April 26, 2012, ITT issued a press release reporting its first quarter 2012 financial results.  The Company reported net income of $61.1 million, or $2.38 in diluted EPS, and revenue of $341.8 million for the first quarter of 2012.

96.    Later that day, ITT filed with the SEC its quarterly report on Form 10-Q for the first quarter of 2012 (the "1Q2012 10-Q"), which included the same results previously reported in the Company's April 26, 2012 press release.  In the 1Q2012 10-Q, the Company again assured investors that it properly omitted its RSA exposure from its financial statements, telling investors that ITT was "not the primary beneficiary of the PEAKS Trust" and, therefore, was "not required under ASC 810 to include the financial results of the PEAKS Trust in our condensed consolidated financial statements."

97.    The 1Q2012 10-Q included similar representations with respect to the 2009 RSA, stating that the Company was "not the primary beneficiary of the 2009 Entity" and "[a]s a result, we are not required under ASC 810 to include the financial results of the 2009 Entity in our condensed consolidated financial statements."

98.     The Company also continued to assert that the reserves supporting its obligations under the RSAs were "reasonably estimated" and that ITT's "recorded liability for these claims and contingencies was approximately $37.5 million" and "the substantial majority of this amount pertains to our guarantee arrangements under the RSAs."

99.     The 1Q2012 10-Q was signed by CFO Fitzpatrick and contained certifications by CEO Modany and CFO Fitzpatrick that attested to the purported accuracy and completeness of the Company's 1Q2012 10-Q.

## THE TRUTH BEGINS TO BE REVEALED

100.     On July 26, 2012, the truth regarding ITT's significant liability under the RSAs began to be revealed.  That day, the Company issued a press release with its results for the second quarter of 2012.  Up to this point, all of ITT's exposure to the losses arising from student loans issued under the RSAs had been kept off ITT's balance sheet through improper accounting practices.  However, as a result of the expiration of the 2010 RSA, and ITT's apparent inability to secure lenders to fund a new RSA, ITT began lending to students directly.  The performance of these direct loans was so poor that the Company was forced to increase its allowance for doubtful accounts and its bad debt expense.  In connection with the disclosure of the poor performance of the loans ITT initiated directly, the Company also implicitly revealed to investors that the loans previously issued through the RSAs had experienced similarly poor performance.

101.     These disclosures were the first time the Company revealed that its liability under the RSAs was more significant than ITT had previously represented.  Indeed, in response to these disclosures, at least one analyst at PAA Research LLC ("PAA") wrote that ITT faced significant risks from its contingent liabilities under the RSAs—far greater exposure than the negligible risks the Company had described to investors.  *See* Bradley Safalow, *ESI: Where Did the Cash Go? ESI's Leverage Looms Large as Prospective FCF Generation Dwindles, Reducing*

*Target to $30*, PAA Research LLC, July 26, 2012. According to PAA, these risks were so serious that it urged management to act immediately in order to solidify the Company's capital position.

102.    Following these disclosures, ITT's stock price dropped $7.65 per share, or 15.1 percent, to close at $42.78 per share on July 26, 2012, representing a market capitalization loss of approximately $180 million.

103.    Although the truth regarding the Company's exposure under the RSAs began seeping into the marketplace, ITT continued to conceal the true extent of its RSA liabilities by omitting these liabilities from its financial statements. Indeed, on July 27, 2012, ITT filed with the SEC its quarterly report on Form 10-Q for the second quarter of 2012 (the "2Q2012 10-Q"), which included the same results previously reported in the Company's July 26, 2012 press release and assurances that ITT had properly omitted its obligations under the RSAs from its financial statements. Specifically, the Company stated that it was "not the primary beneficiary of the PEAKS Trust" and therefore was "not required under ASC 810 to include the financial results of the PEAKS Trust in our condensed consolidated financial statements."

104.    The 2Q2012 10-Q made similar representations regarding the 2009 RSA, stating that the Company was "not the primary beneficiary of the 2009 Entity" and "[a] s a result, we are not required under ASC 810 to include the financial results of the 2009 Entity in our condensed consolidated financial statements."

105.    The Company also continued to assert that the reserves supporting its obligations under the RSAs were "reasonably estimated" and that ITT's "recorded liability for these claims and contingencies was approximately $41.6 million, the substantial majority of which pertained to our guarantee arrangements under the RSAs."

26

106.    The 2Q2012 10-Q was signed by CFO Fitzpatrick and contained certifications by CEO Modany and CFO Fitzpatrick that attested to the purported accuracy and completeness of the Company's 2Q2012 10-Q.

107.    On October 25, 2012, ITT issued a press release reporting its third quarter 2012 financial results.  The Company reported net income of $42.9 million, or $1.83 in diluted EPS, and revenue of $314.7 million for the third quarter of 2012.

108.    After releasing its third quarter 2012 results on October 25, 2012, ITT hosted a conference call for analysts, media representatives, and investors during which CEO Modany continued to reassure investors that the Company's liabilities under the RSAs was limited. Specifically, Modany assured investors that with respect to the Company's private lending, he: "wouldn't say that we've seen any material degradation in that.  It hasn't really changed materially."

109.    On October 29, 2012, ITT filed with the SEC its quarterly report on Form 10-Q for the third quarter of 2012 (the "3Q2012 10-Q"), which included the same results previously reported in the Company's October 25, 2012 press release.  In the 3Q2012 10-Q, the Company continued to assure investors that it properly omitted its obligations under the RSAs from its financial statements.  Specifically, the 3Q2012 10-Q stated that ITT was "not the primary beneficiary of the PEAKS Trust" and, therefore, was "not required under ASC 810 to include the financial results of the PEAKS Trust in our condensed consolidated financial statements."

110.    The 3Q2012 10-Q made similar representations regarding the 2009 RSA, stating that the Company was "not the primary beneficiary of the 2009 Entity" and "[a]s a result, we are not required under ASC 810 to include the financial results of the 2009 Entity in our condensed consolidated financial statements."

111.    The Company also continued to assert that the reserves supporting its obligations under the RSAs were "reasonably estimated" and that ITT's "recorded liability for these claims and contingencies was approximately $44.3 million, the substantial majority of which pertained to our guarantee arrangements under the RSAs."

112.    The 3Q2012 10-Q was signed by CFO Fitzpatrick and contained certifications by CEO Modany and CFO Fitzpatrick that attested to the purported accuracy and completeness of the Company's 3Q2012 10-Q.

113.    Then, on January 4, 2013, ITT filed a current report on Form 8-K disclosing that it had settled an action brought by Sallie Mae arising out of the Company's guarantee obligations under the 2007 RSA.  ITT revealed that it settled this action for $46 million—nearly double the $26 million that Sallie Mae had originally sought, and well more than shareholders were expecting, especially considering the Company had estimated its liabilities at $44.3 million for *all* of the RSAs as of September 30, 2012.  In connection with this settlement, ITT took a $13.2 million charge for the 2007 RSA and an additional $70 million charge to establish a reserve related to the 2009 and 2010 RSAs.  As noted above, these charges, and in particular the reserve for likely losses on the 2009 and 2010 RSAs, should have been booked into the Company's financial statements long before January 2013, and by not establishing that reserve, the Company significantly understated its liabilities and overstated its net income.

114.    According to PAA, the Company's failure to account for its actual liability under the 2007 RSA caused ITT to effectively overstate its earnings by $0.06-$0.08 per share for the previous two years.  Bradley Safalow, *ESI: 10-K Highlights – the SEC Subpoena Is Not the Sole Cause for Concern*, PAA Research LLC, Feb. 25, 2013.  That overstatement does not account for

the failure to reserve for the 2009 and 2010 RSAs, which the Company has admitted required additional reserves of at least $70 million.

115.    Moreover, according to analysts, the Sallie Mae settlement suggested that the cumulative loss rates on ITT's 2009 and 2010 RSAs could be as high as 80 percent.  In fact, PAA stated that it is highly likely that the loans issued pursuant to those RSAs would experience larger losses than the 2007 RSA.  Safalow, Feb. 25, 2013, *supra*.  Should these losses occur, analysts estimate that the Company could face up to an additional $190 million in repayment obligations over the next three years.

116.    Following the disclosure of the Sallie Mae settlement and the implications for the Company's liability under all the RSAs, the price of ITT stock dropped $3.72 per share, or $19.2 percent, to close at $15.57 per share on January 7, 2013.

117.    Finally, after the market closed on February 22, 2013, ITT filed an annual report on Form 10-K in which it disclosed that it had received a subpoena from the SEC on February 8, 2013 that requested the production of documents relating to ITT's accounting for the 2009 and 2010 RSAs.

118.    During the Class Period, ITT remained steadfast in its position that it was not required to include the liabilities from the RSAs on its balance sheet.  By refusing to include liabilities related to the RSAs on its balance sheet, the Company improperly understated its liabilities and overstated its financial strength.  PAA analyst Bradley Safalow was "stunned" to learn that the liabilities under the PEAKS Program had not already been consolidated onto ITT's balance sheet, and stated that the subpoena increases the risks that ITT may be required to restate earnings or be subject to significant civil penalties and fines.  Safalow, Feb 25, 2013, *supra*.

119. Following the announcement of the SEC subpoena, ITT's stock price fell $3.10 per share, or 16.6 percent, to close at $15.53 per share on February 25, 2013.

120. The true facts, which were known by the Defendants but concealed from the investing public during the Class Period, were as follows:

(a) the Company had tremendous liability under the RSAs;

(b) the Company continually downplayed its risks associated with the RSAs and assured investors that it had properly set aside reserves to meet its liabilities;

(c) the Company was improperly accounting for the RSAs, and its accounting practices were repeatedly questioned by the SEC and are now the subject of a formal SEC investigation; and

(d) by failing to book adequate reserves for its liabilities under the RSAs, the Company misrepresented its earnings throughout the Class Period.

121. As a result of Defendants' false statements, ITT common stock traded at artificially inflated levels during the Class Period. When Defendants revealed ITT's true financial condition and future business prospects, the price of ITT common stock fell more than 85 percent from its Class Period high.

## LOSS CAUSATION

122. During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of ITT common stock, and operated as a fraud or deceit on Class-Period purchasers of ITT common stock by misrepresenting the state of the Company's liabilities related to RSAs and its financial results and business prospects. Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market on July 26, 2012, January 4, 2013, and February 22, 2013, the price of ITT common stock fell

precipitously, as the prior artificial inflation came out of the price over time.  As a result of their purchases of ITT common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

123.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased the common stock of ITT during the Class Period (the "Class").  Excluded from the Class are Defendants and their families, directors, and officers of ITT and their families and affiliates.

124.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of January 31, 2013, ITT had 23,348,995 shares of common stock outstanding, owned by thousands of persons.

125.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    Whether the Exchange Act was violated by Defendants;

(b)    Whether Defendants omitted and/or misrepresented material facts;

(c)    Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e)    Whether the price of ITT common stock was artificially inflated; and

(f)    The extent of damage sustained by Class members and the appropriate measure of damages.

126.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

127.    Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

128.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

129.    ITT's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

130.    Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of ITT who knew that the FLS was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## ADDITIONAL ALLEGATIONS REGARDING SCIENTER

131.    During the Class Period, Defendants had both the motive and opportunity to commit fraud.  They also had actual knowledge of the misleading nature of the statements they made or acted with reckless disregard for the true information known to them at the time for the reasons discussed above.  In so doing, Defendants committed acts, and practiced and participated in a course of business that operated as a fraud or deceit on purchasers of ITT common stock during the Class Period.

## PRESUMPTION OF RELIANCE

132.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     the Company's stock traded in an efficient market;

(d)     the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)     Plaintiff and other members of the Class purchased ITT common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

133.    At all relevant times, the markets for ITT common stock were efficient for the following reasons, among others:

(a)     as a regulated issuer, ITT filed periodic public reports with the SEC;

(b)     ITT regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the

major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

        (c)     ITT was followed by several securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

        (d)     ITT common stock was actively traded in an efficient market, namely the NYSE, under the ticker symbol "ESI."

134.    As a result of the foregoing, the market for ITT securities promptly digested current information regarding ITT from all publicly available sources and reflected such information in ITT's stock price.  Under these circumstances, all purchasers of ITT common stock during the Class Period suffered similar injury through their purchase of ITT common stock at artificially inflated prices and the presumption of reliance applies.

## COUNT  I

**For Violation of Section 10(b) of the Exchange Act**
**and Rule 10b-5 Against All Defendants**

135.    Plaintiff repeats, incorporates, and realleges paragraphs 1 through 134 by reference.

136.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

137.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes, and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of ITT common stock during the Class Period.

138.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for ITT common stock.  Plaintiff and the Class would not have purchased ITT common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

139.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of ITT common stock during the Class Period.

## COUNT  II

### For Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

140.    Plaintiff repeats, incorporates, and realleges paragraphs 1 through 139 by reference.

141.    The Individual Defendants acted as controlling persons of ITT within the meaning of Section 20(a) of the Exchange Act.  By virtue of their positions and their power to control public statements about ITT, the Individual Defendants had the power and ability to control the actions of ITT and its employees.  ITT controlled the Individual Defendants and its other officers

and employees.  By reason of such conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23;

B.     Awarding Plaintiff and the members of the Class damages and interest;

C.     Awarding Plaintiff's reasonable costs, including attorneys' fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  April 17, 2013

Respectfully submitted,

Christopher J. Keller (CK-2347)
Michael W. Stocker (MS-1309)
Rachel A. Avan (RA-5177)
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York  10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: ckeller@labaton.com
mstocker@labaton.com
ravan@labaton.com

*Counsel for Plaintiff*
*Massachusetts Laborers' Annuity Fund*

## CERTIFICATION

I, Barry McAnarney, as Executive Director of Massachusetts Laborers' Annuity Fund ("Massachusetts Laborers"), hereby certify as follows:

1.    I am fully authorized to enter into and execute this Certification on behalf of Massachusetts Laborers.  I have reviewed a complaint prepared against ITT Educational Services, Inc. ("ITT") alleging violations of the federal securities laws;

2.    Massachusetts Laborers did not purchase securities of ITT at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.    Massachusetts Laborers is willing to serve as a lead plaintiff or representative party in this matter, including providing testimony at deposition and trial, if necessary;

4.    Massachusetts Laborers' transactions in the ITT securities that are the subject of this action are reflected in Exhibit A, attached hereto;

5.    Massachusetts Laborers sought to serve as a lead plaintiff in the following class action filed under the federal securities laws during the last three years:

*Operating Engineers Construction Industry & Miscellaneous Pension Fund v. ITT Educational Services, Inc.*, 1:10-cv-08323 (S.D.N.Y.)

6.    Beyond its pro rata share of any recovery, Massachusetts Laborers will not accept payment for serving as a lead plaintiff on behalf of the Class, except the reimbursement of such reasonable costs and expenses including lost wages as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this _16_ day of April, 2013.

Barry McAnarney
*Executive Director of*
*Massachusetts Laborers' Annuity Fund*

**EXHIBIT A**

**TRANSACTIONS IN ITT EDUCATIONAL SERVICES, INC.**

| Transaction Type | Trade Date | Shares | Price Per Share | Cost / Proceeds |
|---|---|---|---|---|
| Purchase | 01/22/09 | 600.00 | $128.76 | ($77,257.32) |
| Purchase | 01/23/09 | 300.00 | $126.59 | ($37,977.09) |
| Purchase | 01/26/09 | 200.00 | $111.79 | ($22,358.64) |
| Purchase | 01/29/09 | 300.00 | $124.56 | ($37,367.85) |
| Purchase | 02/12/09 | 200.00 | $120.44 | ($24,087.66) |
| Purchase | 02/19/09 | 200.00 | $108.84 | ($21,767.90) |
| Purchase | 03/16/09 | 200.00 | $99.86 | ($19,971.08) |
| Sale | 03/30/09 | -200.00 | $123.80 | $24,760.32 |
| Purchase | 04/07/09 | 300.00 | $104.47 | ($31,340.88) |
| Purchase | 04/13/09 | 500.00 | $98.99 | ($49,494.85) |
| Purchase | 04/14/09 | 300.00 | $102.18 | ($30,654.18) |
| Purchase | 04/21/09 | 300.00 | $97.97 | ($29,389.80) |
| Purchase | 04/23/09 | 500.00 | $99.04 | ($49,521.05) |
| Purchase | 04/29/09 | 400.00 | $98.24 | ($39,294.40) |
| Purchase | 05/01/09 | 300.00 | $96.68 | ($29,004.72) |
| Purchase | 05/04/09 | 200.00 | $93.21 | ($18,642.06) |
| Purchase | 05/07/09 | 200.00 | $93.24 | ($18,648.96) |
| Purchase | 05/11/09 | 300.00 | $96.71 | ($29,013.30) |
| Purchase | 05/12/09 | 200.00 | $98.19 | ($19,638.74) |
| Purchase | 06/11/09 | 400.00 | $94.87 | ($37,947.08) |
| Purchase | 06/17/09 | 400.00 | $97.57 | ($39,027.04) |
| Purchase | 07/17/09 | 400.00 | $97.41 | ($38,963.68) |
| Purchase | 07/20/09 | 300.00 | $96.68 | ($29,002.65) |
| Purchase | 07/28/09 | 400.00 | $96.96 | ($38,782.64) |
| Purchase | 08/03/09 | 500.00 | $100.33 | ($50,164.90) |
| Purchase | 08/18/09 | 300.00 | $104.38 | ($31,314.57) |
| Purchase | 08/25/09 | 300.00 | $107.47 | ($32,240.49) |
| Purchase | 09/09/09 | 200.00 | $103.29 | ($20,658.88) |
| Purchase | 09/15/09 | 700.00 | $99.76 | ($69,829.97) |
| Purchase | 09/29/09 | 200.00 | $111.10 | ($22,220.34) |
| Purchase | 10/12/09 | 500.00 | $112.52 | ($56,258.60) |
| Purchase | 10/22/09 | 600.00 | $98.87 | ($59,319.00) |
| Purchase | 10/28/09 | 600.00 | $93.00 | ($55,800.00) |
| Purchase | 10/29/09 | 400.00 | $92.24 | ($36,895.96) |
| Purchase | 11/02/09 | 300.00 | $92.13 | ($27,639.06) |
| Purchase | 12/08/09 | 600.00 | $87.85 | ($52,709.46) |
| Sale | 12/14/09 | -300.00 | $96.10 | $28,828.59 |
| Sale | 12/15/09 | -300.00 | $97.22 | $29,165.22 |
| Purchase | 12/18/09 | 500.00 | $89.25 | ($44,623.45) |
| Purchase | 12/22/09 | 300.00 | $93.51 | ($28,053.00) |
| Purchase | 12/24/09 | 400.00 | $93.69 | ($37,475.56) |

| Transaction Type | Trade Date | Shares | Price Per Share | Cost / Proceeds |
|---|---|---|---|---|
| Purchase | 12/28/09 | 500.00 | $96.24 | ($48,119.35) |
| Sale | 01/07/10 | -300.00 | $102.02 | $30,605.58 |
| Purchase | 01/21/10 | 400.00 | $104.23 | ($41,693.08) |
| Sale | 01/22/10 | -200.00 | $109.85 | $21,970.46 |
| Sale | 01/22/10 | -200.00 | $109.87 | $21,973.92 |
| Sale | 01/22/10 | -400.00 | $109.12 | $43,647.40 |
| Sale | 01/26/10 | -100.00 | $110.01 | $11,000.51 |
| Sale | 01/27/10 | -400.00 | $113.26 | $45,304.00 |
| Purchase | 01/28/10 | 500.00 | $106.26 | ($53,130.00) |
| Purchase | 01/28/10 | 500.00 | $107.79 | ($53,893.30) |
| Purchase | 01/29/10 | 500.00 | $100.87 | ($50,436.80) |
| Purchase | 02/01/10 | 400.00 | $94.91 | ($37,964.76) |
| Purchase | 02/02/10 | 200.00 | $95.83 | ($19,165.90) |
| Purchase | 02/03/10 | 500.00 | $98.83 | ($49,416.00) |
| Purchase | 02/10/10 | 200.00 | $93.91 | ($18,781.06) |
| Purchase | 02/11/10 | 700.00 | $93.52 | ($65,465.82) |
| Sale | 02/26/10 | -400.00 | $109.94 | $43,976.00 |
| Purchase | 03/02/10 | 600.00 | $106.26 | ($63,756.00) |
| Sale | 03/03/10 | -3,200.00 | $109.78 | $351,296.00 |
| Sale | 03/18/10 | -300.00 | $115.35 | $34,605.00 |
| Purchase | 03/29/10 | 200.00 | $113.09 | ($22,618.24) |
| Sale | 04/13/10 | -500.00 | $118.90 | $59,451.50 |
| Sale | 04/13/10 | -100.00 | $118.40 | $11,840.00 |
| Sale | 04/13/10 | -400.00 | $118.73 | $47,492.32 |
| Sale | 04/13/10 | -200.00 | $117.40 | $23,480.60 |
| Sale | 04/13/10 | -300.00 | $117.98 | $35,394.93 |
| Sale | 04/13/10 | -400.00 | $119.15 | $47,658.40 |
| Sale | 04/14/10 | -200.00 | $116.90 | $23,379.64 |
| Sale | 04/14/10 | -200.00 | $115.62 | $23,123.52 |
| Purchase | 04/16/10 | 400.00 | $114.00 | ($45,599.12) |
| Purchase | 04/19/10 | 200.00 | $112.95 | ($22,589.00) |
| Purchase | 04/20/10 | 200.00 | $111.07 | ($22,214.44) |
| Purchase | 04/22/10 | 200.00 | $111.48 | ($22,295.12) |
| Purchase | 04/23/10 | 300.00 | $110.00 | ($32,999.70) |
| Purchase | 04/23/10 | 200.00 | $111.16 | ($22,232.38) |
| Purchase | 04/26/10 | 100.00 | $108.53 | ($10,853.32) |
| Purchase | 04/28/10 | 400.00 | $110.46 | ($44,184.24) |
| Purchase | 04/29/10 | 1,100.00 | $103.72 | ($114,091.23) |
| Purchase | 05/03/10 | 600.00 | $103.80 | ($62,281.92) |
| Purchase | 05/04/10 | 400.00 | $99.74 | ($39,894.52) |
| Sale | 05/12/10 | -100.00 | $106.10 | $10,610.00 |
| Sale | 05/13/10 | -200.00 | $107.20 | $21,440.96 |
| Sale | 05/17/10 | -200.00 | $110.20 | $22,039.08 |
| Sale | 05/17/10 | -300.00 | $109.99 | $32,997.54 |

| Transaction Type | Trade Date | Shares | Price Per Share | Cost / Proceeds |
|---|---|---|---|---|
| Sale | 05/18/10 | -400.00 | $111.20 | $44,480.56 |
| Sale | 05/18/10 | -200.00 | $108.74 | $21,748.16 |
| Sale | 05/19/10 | -200.00 | $111.47 | $22,294.08 |
| Sale | 05/20/10 | -200.00 | $112.65 | $22,530.18 |
| Sale | 05/20/10 | -300.00 | $110.39 | $33,117.42 |
| Purchase | 05/26/10 | 200.00 | $104.76 | ($20,951.52) |
| Purchase | 05/27/10 | 200.00 | $104.47 | ($20,894.12) |
| Purchase | 06/04/10 | 900.00 | $99.72 | ($89,746.11) |
| Purchase | 06/11/10 | 400.00 | $96.85 | ($38,739.80) |
| Purchase | 06/11/10 | 200.00 | $96.98 | ($19,396.44) |
| Purchase | 06/17/10 | 200.00 | $96.33 | ($19,266.00) |
| Purchase | 06/18/10 | 200.00 | $95.87 | ($19,173.72) |
| Purchase | 06/22/10 | 300.00 | $91.27 | ($27,380.67) |
| Purchase | 06/29/10 | 500.00 | $85.54 | ($42,770.00) |
| Purchase | 07/02/10 | 800.00 | $79.42 | ($63,536.16) |
| Purchase | 07/07/10 | 200.00 | $81.10 | ($16,220.00) |
| Sale | 07/19/10 | -400.00 | $92.79 | $37,116.44 |
| Sale | 07/19/10 | -1,100.00 | $94.50 | $103,954.95 |
| Sale | 07/19/10 | -300.00 | $94.22 | $28,265.85 |
| Purchase | 07/20/10 | 200.00 | $87.50 | ($17,500.00) |
| Purchase | 07/22/10 | 400.00 | $86.50 | ($34,600.00) |
| Purchase | 07/23/10 | 400.00 | $86.25 | ($34,500.00) |
| Purchase | 07/23/10 | 500.00 | $86.77 | ($43,385.55) |
| Purchase | 07/26/10 | 400.00 | $83.43 | ($33,370.68) |
| Purchase | 07/27/10 | 300.00 | $81.82 | ($24,546.60) |
| Purchase | 07/29/10 | 400.00 | $79.89 | ($31,954.32) |
| Purchase | 08/03/10 | 300.00 | $79.56 | ($23,868.81) |
| Purchase | 08/06/10 | 300.00 | $70.57 | ($21,171.60) |
| Purchase | 08/16/10 | 400.00 | $56.98 | ($22,792.96) |
| Purchase | 08/19/10 | 500.00 | $52.65 | ($26,327.00) |
| Purchase | 08/31/10 | 500.00 | $53.72 | ($26,857.50) |
| Purchase | 09/08/10 | 300.00 | $54.93 | ($16,479.42) |
| Purchase | 09/13/10 | 200.00 | $57.57 | ($11,514.00) |
| Sale | 09/16/10 | -200.00 | $60.30 | $12,060.12 |
| Sale | 09/16/10 | -100.00 | $59.72 | $5,972.00 |
| Sale | 09/17/10 | -400.00 | $61.52 | $24,606.56 |
| Sale | 09/20/10 | -300.00 | $65.19 | $19,557.00 |
| Sale | 09/23/10 | -300.00 | $69.84 | $20,951.58 |
| Sale | 09/23/10 | -400.00 | $68.75 | $27,501.08 |
| Sale | 09/23/10 | -300.00 | $69.58 | $20,873.40 |
| Purchase | 09/27/10 | 700.00 | $63.75 | ($44,626.96) |
| Purchase | 09/30/10 | 600.00 | $66.00 | ($39,600.18) |
| Sale | 09/30/10 | -300.00 | $71.66 | $21,499.11 |
| Sale | 09/30/10 | -400.00 | $71.00 | $28,400.00 |

- 3 -

| Transaction Type | Trade Date | Shares | Price Per Share | Cost / Proceeds |
|---|---|---|---|---|
| Sale | 10/01/10 | -300.00 | $71.77 | $21,532.23 |
| Purchase | 10/07/10 | 400.00 | $67.63 | ($27,051.08) |
| Purchase | 10/13/10 | 300.00 | $66.19 | ($19,856.70) |
| Purchase | 10/14/10 | 900.00 | $53.99 | ($48,591.00) |
| Sale | 10/20/10 | -200.00 | $59.41 | $11,882.16 |
| Purchase | 10/21/10 | 800.00 | $56.98 | ($45,587.28) |
| Sale | 10/25/10 | -300.00 | $63.48 | $19,044.00 |
| Sale | 10/26/10 | -300.00 | $62.75 | $18,825.75 |
| Purchase | 11/02/10 | 300.00 | $65.24 | ($19,572.00) |
| Purchase | 11/03/10 | 500.00 | $61.70 | ($30,850.65) |
| Purchase | 11/08/10 | 700.00 | $61.57 | ($43,096.13) |
| Purchase | 11/09/10 | 500.00 | $61.22 | ($30,610.90) |
| Purchase | 11/16/10 | 300.00 | $62.13 | ($18,639.00) |
| Purchase | 11/18/10 | 800.00 | $61.77 | ($49,416.56) |
| Purchase | 11/22/10 | 400.00 | $61.22 | ($24,489.04) |
| Purchase | 11/23/10 | 100.00 | $61.18 | ($6,118.34) |
| Purchase | 11/24/10 | 400.00 | $60.50 | ($24,199.16) |
| Purchase | 11/26/10 | 600.00 | $59.97 | ($35,981.40) |
| Purchase | 11/29/10 | 200.00 | $59.92 | ($11,984.22) |
| Purchase | 12/08/10 | 400.00 | $62.83 | ($25,130.68) |
| Purchase | 12/09/10 | 400.00 | $60.32 | ($24,128.20) |
| Purchase | 12/10/10 | 100.00 | $58.77 | ($5,877.00) |
| Purchase | 12/14/10 | 1,200.00 | $62.22 | ($74,667.84) |
| Purchase | 12/16/10 | 500.00 | $61.08 | ($30,539.85) |
| Purchase | 12/17/10 | 400.00 | $62.60 | ($25,041.28) |
| Purchase | 12/20/10 | 400.00 | $64.20 | ($25,679.12) |
| Purchase | 12/21/10 | 500.00 | $62.46 | ($31,229.25) |
| Purchase | 12/22/10 | 400.00 | $63.55 | ($25,420.60) |
| Purchase | 01/07/11 | 400.00 | $64.89 | ($25,954.96) |
| Purchase | 01/13/11 | 300.00 | $63.94 | ($19,183.35) |
| Purchase | 01/14/11 | 300.00 | $65.20 | ($19,560.00) |
| Sale | 01/20/11 | -400.00 | $69.79 | $27,917.40 |
| Sale | 01/20/11 | -200.00 | $68.46 | $13,691.52 |
| Sale | 01/20/11 | -200.00 | $68.83 | $13,765.24 |
| Sale | 01/21/11 | -400.00 | $70.66 | $28,262.64 |
| Sale | 01/21/11 | -200.00 | $71.20 | $14,240.46 |
| Sale | 01/21/11 | -200.00 | $70.72 | $14,143.92 |
| Sale | 01/24/11 | -300.00 | $73.52 | $22,055.34 |
| Sale | 01/24/11 | -300.00 | $74.00 | $22,200.00 |
| Sale | 01/24/11 | -300.00 | $72.51 | $21,752.67 |
| Purchase | 01/28/11 | 400.00 | $66.29 | ($26,515.52) |
| Purchase | 01/28/11 | 800.00 | $67.13 | ($53,705.20) |
| Purchase | 02/01/11 | 500.00 | $66.59 | ($33,294.50) |
| Purchase | 02/04/11 | 500.00 | $64.95 | ($32,473.40) |

| Transaction Type | Trade Date | Shares | Price Per Share | Cost / Proceeds |
|---|---|---|---|---|
| Purchase | 02/08/11 | 400.00 | $64.72 | ($25,886.24) |
| Purchase | 02/09/11 | 400.00 | $64.93 | ($25,971.24) |
| Purchase | 02/14/11 | 300.00 | $68.27 | ($20,481.54) |
| Purchase | 02/15/11 | 200.00 | $67.58 | ($13,515.92) |
| Sale | 02/18/11 | -300.00 | $72.81 | $21,842.91 |
| Sale | 02/22/11 | -100.00 | $73.27 | $7,326.72 |
| Sale | 02/22/11 | -300.00 | $73.30 | $21,989.19 |
| Sale | 02/24/11 | -100.00 | $73.31 | $7,330.73 |
| Sale | 02/25/11 | -300.00 | $75.26 | $22,577.58 |
| Purchase | 03/15/11 | 500.00 | $69.26 | ($34,628.10) |
| Purchase | 03/17/11 | 500.00 | $67.48 | ($33,739.00) |
| Purchase | 03/22/11 | 600.00 | $69.86 | ($41,917.08) |
| Purchase | 03/23/11 | 300.00 | $69.59 | ($20,878.47) |
| Sale | 04/04/11 | -300.00 | $73.42 | $22,026.00 |
| Sale | 04/06/11 | -200.00 | $78.13 | $15,626.24 |
| Sale | 04/06/11 | -200.00 | $78.81 | $15,761.08 |
| Purchase | 04/15/11 | 100.00 | $67.70 | ($6,770.25) |
| Sale | 05/31/11 | -2,600.00 | $70.19 | $182,495.30 |
| Sale | 06/01/11 | -1,200.00 | $71.02 | $85,221.00 |
| Sale | 06/01/11 | -2,000.00 | $70.84 | $141,682.00 |
| Sale | 06/02/11 | -1,000.00 | $85.88 | $85,881.40 |
| Sale | 06/02/11 | -1,000.00 | $89.86 | $89,864.20 |
| Sale | 06/03/11 | -100.00 | $86.45 | $8,645.44 |
| Sale | 07/01/11 | -200.00 | $80.57 | $16,114.78 |
| Sale | 07/01/11 | -200.00 | $80.22 | $16,043.66 |
| Sale | 07/06/11 | -100.00 | $82.01 | $8,200.95 |
| Sale | 07/06/11 | -100.00 | $84.50 | $8,449.69 |
| Sale | 07/06/11 | -200.00 | $85.28 | $17,056.20 |
| Sale | 07/07/11 | -300.00 | $90.03 | $27,007.74 |
| Sale | 07/07/11 | -100.00 | $89.06 | $8,906.00 |
| Sale | 07/07/11 | -100.00 | $89.85 | $8,985.00 |
| Sale | 07/07/11 | -100.00 | $87.47 | $8,746.99 |
| Sale | 07/07/11 | -200.00 | $91.19 | $18,237.28 |
| Sale | 07/13/11 | -200.00 | $91.55 | $18,309.84 |
| Sale | 07/14/11 | -200.00 | $93.37 | $18,673.16 |
| Sale | 07/14/11 | -200.00 | $93.60 | $18,720.48 |
| Sale | 07/19/11 | -200.00 | $94.42 | $18,884.00 |
| Sale | 07/19/11 | -500.00 | $91.51 | $45,754.35 |
| Sale | 07/20/11 | -100.00 | $92.07 | $9,207.00 |
| Sale | 07/20/11 | -200.00 | $93.78 | $18,756.42 |
| Sale | 07/20/11 | -300.00 | $93.53 | $28,058.88 |
| Purchase | 07/21/11 | 200.00 | $87.20 | ($17,440.60) |
| Purchase | 07/22/11 | 200.00 | $88.08 | ($17,615.30) |
| Sale | 07/25/11 | -200.00 | $90.86 | $18,172.96 |

| Transaction Type | Trade Date | Shares | Price Per Share | Cost / Proceeds |
|---|---|---|---|---|
| Purchase | 08/01/11 | 200.00 | $85.65 | ($17,129.10) |
| Sale | 08/16/11 | -100.00 | $76.02 | $7,602.00 |
| Sale | 08/16/11 | -100.00 | $76.87 | $7,687.00 |
| Sale | 08/16/11 | -200.00 | $75.25 | $15,050.72 |
| Purchase | 08/22/11 | 400.00 | $69.72 | ($27,886.96) |
| Purchase | 09/29/11 | 200.00 | $60.32 | ($12,063.12) |
| Sale | 10/06/11 | -200.00 | $63.55 | $12,710.00 |
| Purchase | 10/18/11 | 400.00 | $59.41 | ($23,765.72) |
| Sale | 10/20/11 | -200.00 | $62.27 | $12,453.54 |
| Sale | 10/20/11 | -300.00 | $61.48 | $18,444.75 |
| Sale | 10/21/11 | -200.00 | $63.81 | $12,762.40 |
| Sale | 10/21/11 | -200.00 | $62.85 | $12,569.62 |
| Sale | 10/24/11 | -300.00 | $66.27 | $19,881.48 |
| Sale | 10/24/11 | -200.00 | $66.43 | $13,286.74 |
| Sale | 10/24/11 | -200.00 | $65.70 | $13,140.32 |
| Sale | 10/25/11 | -200.00 | $66.90 | $13,380.72 |
| Sale | 10/27/11 | -400.00 | $69.15 | $27,659.32 |
| Sale | 10/31/11 | -4,500.00 | $61.96 | $278,820.00 |
| Purchase | 11/01/11 | 400.00 | $59.82 | ($23,926.60) |
| Purchase | 11/02/11 | 400.00 | $57.82 | ($23,126.12) |
| Purchase | 11/03/11 | 500.00 | $57.39 | ($28,696.10) |
| Purchase | 11/03/11 | 300.00 | $58.59 | ($17,577.03) |
| Purchase | 11/07/11 | 400.00 | $60.84 | ($24,334.68) |
| Purchase | 11/10/11 | 200.00 | $59.35 | ($11,870.10) |
| Purchase | 11/18/11 | 200.00 | $56.08 | ($11,216.14) |
| Purchase | 12/13/11 | 300.00 | $51.54 | ($15,462.00) |
| Sale | 12/29/11 | -5,600.00 | $56.89 | $318,590.72 |
| Sale | 01/05/12 | -100.00 | $59.59 | $5,959.44 |
| Sale | 01/06/12 | -300.00 | $61.80 | $18,540.00 |
| Sale | 01/06/12 | -300.00 | $62.50 | $18,750.00 |
| Sale | 01/06/12 | -200.00 | $63.79 | $12,757.18 |
| Sale | 01/09/12 | -100.00 | $64.21 | $6,421.29 |
| Sale | 01/11/12 | -200.00 | $65.08 | $13,016.26 |
| Sale | 01/17/12 | -200.00 | $65.10 | $13,020.16 |
| Sale | 01/17/12 | -200.00 | $66.02 | $13,204.42 |
| Sale | 01/18/12 | -100.00 | $65.81 | $6,581.00 |
| Sale | 01/19/12 | -200.00 | $70.36 | $14,072.24 |
| Sale | 01/25/12 | -200.00 | $68.46 | $13,692.64 |
| Sale | 01/25/12 | -100.00 | $69.14 | $6,914.30 |
| Purchase | 01/26/12 | 100.00 | $63.47 | ($6,347.28) |
| Sale | 01/27/12 | -200.00 | $67.41 | $13,482.04 |
| Sale | 02/01/12 | -100.00 | $68.31 | $6,831.00 |
| Sale | 02/03/12 | -200.00 | $69.45 | $13,889.26 |
| Sale | 02/09/12 | -200.00 | $73.73 | $14,746.96 |

| Transaction Type | Trade Date | Shares | Price Per Share | Cost / Proceeds |
|---|---|---|---|---|
| Sale | 02/09/12 | -200.00 | $74.01 | $14,802.70 |
| Sale | 02/23/12 | -300.00 | $74.06 | $22,217.07 |
| Purchase | 02/28/12 | 300.00 | $67.20 | ($20,161.26) |
| Purchase | 03/01/12 | 300.00 | $69.56 | ($20,867.13) |
| Purchase | 03/08/12 | 200.00 | $63.19 | ($12,638.64) |
| Purchase | 03/09/12 | 100.00 | $63.88 | ($6,388.07) |
| Purchase | 03/14/12 | 200.00 | $63.19 | ($12,638.34) |
| Purchase | 03/15/12 | 100.00 | $64.80 | ($6,480.34) |
| Sale | 03/20/12 | -100.00 | $67.01 | $6,701.00 |
| Sale | 03/26/12 | -100.00 | $68.00 | $6,800.00 |
| Purchase | 03/28/12 | 200.00 | $63.82 | ($12,764.84) |
| Purchase | 03/29/12 | 200.00 | $63.75 | ($12,750.06) |
| Sale | 04/02/12 | -500.00 | $68.10 | $34,052.45 |
| Sale | 04/03/12 | -200.00 | $70.09 | $14,017.14 |
| Purchase | 04/09/12 | 100.00 | $63.95 | ($6,395.27) |
| Purchase | 04/13/12 | 300.00 | $62.62 | ($18,786.00) |
| Purchase | 04/16/12 | 200.00 | $61.70 | ($12,340.48) |
| Purchase | 04/24/12 | 200.00 | $60.76 | ($12,151.18) |
| Sale | 04/26/12 | -100.00 | $66.01 | $6,600.88 |
| Purchase | 05/01/12 | 100.00 | $65.30 | ($6,530.12) |
| Purchase | 05/02/12 | 100.00 | $66.23 | ($6,622.54) |
| Purchase | 05/03/12 | 300.00 | $62.81 | ($18,843.66) |
| Purchase | 06/01/12 | 200.00 | $56.08 | ($11,215.18) |
| Purchase | 06/01/12 | 200.00 | $56.14 | ($11,227.16) |
| Purchase | 06/01/12 | 100.00 | $56.35 | ($5,634.82) |
| Sale | 10/25/12 | -400.00 | $22.60 | $9,041.68 |
| Purchase | 12/12/12 | 500.00 | $19.49 | ($9,747.40) |
| Purchase | 01/03/13 | 500.00 | $17.97 | ($8,985.10) |
| Purchase | 01/04/13 | 400.00 | $19.32 | ($7,729.40) |
| Sale | 01/07/13 | -500.00 | $15.86 | $7,928.10 |
| Sale | 01/07/13 | -300.00 | $16.31 | $4,893.00 |
| Sale | 01/07/13 | -500.00 | $15.33 | $7,662.85 |
| Sale | 01/08/13 | -500.00 | $15.22 | $7,610.60 |
| Sale | 01/09/13 | -700.00 | $14.72 | $10,302.11 |
| Sale | 01/10/13 | -700.00 | $14.31 | $10,016.37 |
| Sale | 01/16/13 | -1,000.00 | $14.44 | $14,440.70 |
| Sale | 01/24/13 | -500.00 | $15.83 | $7,917.35 |
| Sale | 01/24/13 | -900.00 | $13.36 | $12,026.97 |
| Sale | 01/24/13 | -500.00 | $15.56 | $7,779.20 |
| Sale | 01/24/13 | -500.00 | $14.08 | $7,038.80 |
| Sale | 01/24/13 | -400.00 | $16.74 | $6,694.44 |
| Sale | 01/24/13 | -1,000.00 | $12.27 | $12,267.80 |
| Sale | 01/25/13 | -500.00 | $15.86 | $7,927.50 |
| Sale | 02/01/13 | -1,000.00 | $17.45 | $17,452.60 |